Selena CLINGENPEEL, Appellant

v.

ARKANSAS DEPARTMENT OF HUMAN SERVICES,
Appellee.

No. CA 10–1044.

Court of Appeals of Arkansas.

Feb. 2, 2011.

108

Leah Beth Lanford, Little Rock, for appellant.

Keith L. Crestmen, Jonesboro, Tabitha Baertels McNulty, Little Rock, for appellee.

DAVID M. GLOVER, Judge.

Selena Clingenpeel appeals from the termination of her parental rights to her children, J.C., a daughter born September 16, 2008, and A.R., a son born July 23, 2005. A.R.'s father, Kenneth Richards, consented to the termination of his parental rights. J.C.'s paternity has not been established. The only issue on appeal is whether the trial court properly considered the children's adoptability in conducting its best-interest analysis. We affirm.

DHS filed a petition for emergency custody of the children on January 6, 2009, after an altercation between appellant and her boyfriend, Josh Fulbright. The supporting incident report and affidavit stated that Fulbright was arrested and that appellant was taken to the hospital because of a possible overdose after the officers found drugs at the residence; that Richards, who was present, admitted using methamphetamine and smoking marijuana; that Fulbright admitted using methamphetamine, smoking marijuana, drinking, and taking hydrocodone and Klonopin; and that appellant tested positive for methamphetamine at the hospital and was later taken to jail. The circuit court immediately entered an order for emergency custody. The circuit court entered a probable-cause order on January 16, 2009, directing appellant to submit to random drug screens and a drug-and-alcohol assessment and to comply with the recommendations; to take parenting classes; and to obtain and maintain gainful employment and housing. The court conducted an adjudication hearing on February 25, 2009, finding the children dependent-neglected. The court set the goal of reunification with appellant, and the prior orders of the court remained in effect.

The court held a permanency-planning hearing on December 9, 2009, after which it changed the goal to termination of appellant's parental rights. The court found that appellant had not complied with the case plan, noting her substance abuse and how it impaired her ability to protect the children; her November 5, 2009 arrest for DWI with a child in the car; her unresolved alcohol issues; her outstanding warrants; her unemployment; and her lack of housing. The court found that it was in the children's best interest to have no contact with appellant.

On February 5, 2010, DHS filed a petition for termination of appellant's parental rights, joined by the attorney ad litem. It alleged that appellant had not complied

with the orders of the court or the case plan; that she had tested positive for illegal substances several times; that she had not completed parenting classes; that she had not obtained stable and appropriate housing (in fact her whereabouts and living arrangements were unknown); that she had not obtained gainful employment; and that she had not successfully completed inpatient drug treatment, although she had attempted it on three occasions. In the petition, DHS noted that appellant had been arrested for DWI on November 5, 2009.

The court held a termination hearing on June 23, 2010. Appellant testified that, although she had tested positive for methamphetamine in 2009, and that she considered herself a methamphetamine addict, she had been clean for over six months and was in recovery. She admitted that, at the time of the hearing, she was incarcerated; that she had lost contact with DHS a few times; that she had been homeless; that she had lived with different people and had no permanent residence since January 2009; that she had not completed parenting classes; that she had worked in five different places, most recently in March 2010; and that she had not obtained stable employment. She explained: "[S]omething keeps happening." She said that she did jail time after her second DWI in November 2009; that she received a third DWI in December 2009; that she intended to submit to treatment for alcohol when she got out of jail; that she had been to drug treatment three times; that she did not complete the first stay, but completed the second and third attempts; however, she received her third DWI after she completed her third drug-treatment program. She admitted that she had gone back into inpatient treatment for a third time because she had continued to use methamphetamine and had received her second DWI, and that she had lost her job at

Sonic in March 2010 because she was arrested on a hot-check warrant and a failure-to-appear charge. Appellant admitted that her visitation rights had been terminated and that she had withdrawn her consent to allow termination of her parental rights in April 2010; even though she had no home or job and had pending criminal charges, she believed that she could satisfy her legal obligations and obtain a job and housing. She also admitted that, when she was arrested in November 2009, she had children in the car with her.

Siobhan Ming, the case worker from January through October 2009, stated that, after completing drug rehabilitation in May 2009, appellant tested positive for methamphetamine on June 15, 2009. She stated that, after taking a negative drug test, appellant visited her children on July 14 and then went back to jail. Ms. Ming said that the sheriff's department, which had administered a drug test to appellant when she returned to jail, informed her that appellant had tested positive for methamphetamine on July 15. Ms. Ming said that she then went to the detention center to ask appellant how she had passed Ms. Ming's drug test; appellant replied that she had taken a product called Sure–Jell, which had masked her drug use. Ms. Ming said that appellant also tested positive for methamphetamine on the drug screen that she administered on July 28, 2009; that appellant went to Gateway House for her first round of drug treatment in March 2009, where she stayed fifty-nine days without completing the program; that appellant had entered drug treatment at Gateway a third time during the week before the permanency-planning hearing and had not acted as if she wanted help for her drug problem; and to her knowledge, appellant had not completed any drug treatment. She testified that appellant had completed some hours of

parenting classes but had not obtained stable and appropriate housing. She said that she had not been able to conduct a successful home visit with appellant; most of the time, appellant was in jail, and the rest of the time, she would stay with various friends.

Appellant's drug-test reports admitted into evidence revealed that the June 15, July 15, and July 28, 2009 drug tests were positive for methamphetamine. Appellant's driving record was also admitted into evidence, revealing that appellant received DWIs on May 28, 2006, February 28, 2009, and November 5, 2009, and that her license had been suspended. She had many other offenses, including careless driving, driving with a suspended license, and failure to show insurance.

Kristen Shelton testified that she had supervised this case with DHS through its entirety and had become the primary case worker when Ms. Ming was transferred. She stated that DHS completely lost track of appellant when she left Gateway House the second time in September 2009; that appellant showed up at Quapaw House sometime near the end of September or the beginning of October, where she completed thirty days of inpatient treatment and was discharged into their Chem–Free program, which she did not complete. She said that after appellant was discharged into the Chem–Free program, DHS transported appellant from Hot Springs to Franklin County for visits with her children. She stated that DHS lost touch with appellant when she received the second DWI; in fact, she did not know about appellant's third DWI until she heard appellant's testimony at the termination hearing. Ms. Shelton stated that at the time of the hearing, appellant was incarcerated and had no home or employment lined up for after her release. She expressed her belief that it was in the best interest of the children for appellant's parental rights to be terminated and that, if the court granted the petition, the children were adoptable; that someone was already out there who would be willing to adopt them; and that DHS had an adoptive home for the children. Ms. Shelton added that returning the children to appellant presented potential harm because of her unresolved drug and alcohol issues and her pending criminal charges.

Appellant testified that her treatment had been primarily focused on her methamphetamine use and that she had not received any specific treatment for alcohol, which she believed she needed. She stated that her parents, who had lost their house to foreclosure in 2009, had obtained a house in Coal Hill and had offered to let her live with them, but there probably would not be enough room for her and her children to live there. She said that she expected to be released from jail on July 25 and planned to live in her parents' camper and get a job as soon as possible.

At the conclusion of the hearing, the court stated that appellant had regressed and still had substance-abuse issues. It also noted that appellant was homeless and dependent on her parents' generosity for a roof over her head. On July 13, 2010, the court entered an order terminating appellant's parental rights on various findings, including the following finding pertinent to appellant's sole issue on appeal:

a. That termination of parental rights is in the best interest of the juveniles, taking into consideration the likelihood that the juvenile will be adopted if the termination petition is granted. The children have a family that is willing to adopt them and therefore the likelihood of adoption is very high. In making this best interest finding the Court also considered the potential harm to the health and safety of the juveniles, which

would be caused by returning the children to the custody to any of the parents. The Court finds that there would be significant potential harm to the health and safety of the juveniles caused by returning the children to custody of the mother or any fathers. A.C.A. §§ 9–27–341(b)(3)(A)(i) & (ii). During this case the mother has not made any progress and in fact has regressed. The mother is currently incarcerated and will be in the Franklin County Jail until the end of July, 2010. The mother is currently homeless and does not have employment. The mother has been to three (3) substance abuse treatment programs but still has substances abuse issues. During this case the mother has tested positive for methamphetamine on multiple occasions. In addition, the mother received two (2) DWIs during the pendency of this case, one of which has resulted in her current incarceration. . . .

Appellant then pursued this appeal.

■■ Appellant's only argument on appeal is that the court's consideration of the children's adoptability, which is a part of the "best-interest" analysis, was not supported by the evidence. Appellant states that the trial court erred in finding that termination of her parental rights was in the children's best interest because there was no credible evidence regarding the likelihood that they would be adopted.[1] She argues that Ms. Shelton simply relied on the fact that someone would be willing to adopt them and that her testimony was not sufficiently specific as to who had expressed an interest in adopting the children.

■■ We review cases involving the termination of parental rights de novo. *Welch v. Arkansas Dep't of Human Servs.*, 2010 Ark. App. 798, 378 S.W.3d 290. The grounds for termination must be proven by clear and convincing evidence. *Id.* When the burden of proving a disputed fact is by clear and convincing evidence, the question on appeal is whether │ₛthe circuit court's finding that the disputed fact was proven by clear and convincing evidence is clearly erroneous, giving due regard to the opportunity of the circuit court to judge the credibility of the witnesses. *Id.* The termination of parental rights is a two-step process that requires the circuit court to find that the parent is unfit and that termination is in the best interest of the child. *Id.* The first step requires proof of one or more of the statutory grounds for termination. Ark.Code Ann. § 9–27–341(b)(3)(B) (Repl.2009). The second step requires consideration of whether the termination of parental rights is in the child's best interest. Ark.Code Ann. § 9–27–341(b)(3)(A) (Repl.2009). This includes consideration of the likelihood that the juvenile will be adopted and the potential harm caused by returning custody of the child to the parent. The court, however, does not have to determine that every factor considered be established by clear and convincing evidence. *Welch v. Arkansas Dep't of Human Servs., supra.* Instead, after considering all of the factors, the evidence must be clear and convincing that the termination is in the best interest of the child. *Id.*

Appellant has mischaracterized the trial court's statutory obligation regarding adoptability in its best-interest analysis: it must simply consider the likelihood that the children will be adopted; that factor

---

1. Appellant has not challenged the court's termination decision as to grounds. We do not, therefore, address those findings. *Welch v.* *Arkansas Dep't of Human Servs.*, 2010 Ark. App. 798, 378 S.W.3d 290.

need not, however, be established by clear and convincing evidence. The court heard Ms. Shelton's testimony that DHS had an adoptive home for the children and that there was already someone out there who would be willing to adopt them. The court expressly stated from the bench that it had considered the likelihood that the children would be adopted, and in its written order, stated that it had considered adoptability; that there was a family waiting to adopt them; and that the likelihood of adoption was "very high." We see no error in how the court handled this issue.

Affirmed.

ROBBINS and WYNNE, JJ., agree.